**BEDFORD MILLS, Inc., v. UNITED STATES.**

**No. K–92.**

Court of Claims.

June 6, 1932.

The plaintiff sues to recover an alleged overpayment of income and excess profits taxes for the fiscal year 1920. The suit is based upon an alleged overvaluation of plaintiff's inventory made in June, 1920. The issue revolves around observance of the regulations of the Commissioner of Internal Revenue as to valuing inventories when applied to a trader or a manufacturer.

This case having been heard by the Court of Claims, the court, upon the report of a Commissioner and the evidence, makes the following special findings of fact:

1. The plaintiff, Bedford Mills, Incorporated, is a corporation duly organized and existing under and by virtue of the laws of the state of New York.

2. During the period involved herein, the plaintiff was engaged in the cotton textile industry, and in the parlance of the cotton trade was known as a "converter." It first contracted with various cotton mills for cloth to be woven according to its own specifications relating to weight, width, pattern, texture, and yarn colors. Such goods are known as "gray goods" because of their soiled, yellow-

gray color, resulting from the fact that the goods in their rough, unbleached state are full of the natural dirt and grease of the raw cotton and the small dead pieces of cotton which have become woven into the cloth. The plaintiff's contracts for gray goods ordinarily called for from 150,000 to 900,000 yard quantities with deliveries at the rate of 6 per cent. per week of the aggregate quantity contracted for and payment therefor on a ten-day basis as invoiced. The gray goods were never resold as gray goods by the plaintiff, and, with the exception of small samples submitted by the mills, never came into the physical possession of the plaintiff. When sufficient quantities of gray goods had accumulated at the textile mills, the plaintiff then directed their shipment to finishing mills, to be steamed and bleached or bleached and dyed into plain colors, or bleached and printed according to patterns and designs furnished by the plaintiff.

3. The work of the finishing mills was done at a fixed price per yard. The cost of bleaching ranged from approximately three-fourths of a cent to 4 cents per yard, depending on the nature of the cloth and the surface and lustre required on the cloth when completely finished; the cost of dyeing into plain colors ranged from approximately 1½ cents to 8 cents per yard, depending upon the width of the cloth, the colors to be used in the dyeing process, the construction of the cloth, and the final finish required on the cloth; and the cost of printing ranged from approximately 3 cents to 15 cents per yard, depending upon the nature of the cloth to be finished, the amount of the surface of the cloth to be covered by the pattern, the depth of the colors to be used, and the nature and the quality of the colors, and the final finish and the surface required. The finishing mills ordinarily stipulated in submitting their bids for the work to be done that they be allowed a working loss for shrinkage, spoilage, etc., of up to 5 per cent. of the amount of the gray goods to be finished, and allowance for that working loss is included in the finishing costs hereinabove referred to. The patterns and designs used by the printing mills in printing the plaintiff's material were prepared by independent designers and purchased by the plaintiff at a cost of from $10 to $15 per pattern. The first few yards of each cloth as finally finished were sent to the plaintiff to be cut into small samples for the use of its salesmen. The remaining quantities of each run of cloth were measured and cut into strips according to the number of yards required in a piece, folded, papered, packed in cases, placed in the finishing mill's warehouse at a fixed monthly storage price to be held for shipping instructions from the plaintiff, and the plaintiff was billed on a thirty-day basis for the number of yards so finished or processed at the agreed price therefor.

4. The finishing mills as well as the gray goods mills were selected by the plaintiff according to their ability to do the particular work desired and competitive price bids therefor. The plaintiff did not act as factor or commission agent for any mill. It did not own any interest either directly or through its officers in any cotton textile mills, finishing mills, printing plants, or warehouses. The plaintiff confined its sales almost exclusively to the manufacturing and jobbing trades. It sold no goods at retail. Sales to manufacturers were generally in quantities of from 30,000 to 250,000 yards, and sales to jobbers were usually in quantities of from 10,000 to 90,000 yards. When such sales were effected, shipping instructions were then transmitted to the finishing mill in whose warehouse the goods sold were then stored. The plaintiff's goods were ordinarily contracted and paid for in advance of their sale.

5. The plaintiff's principal place of business was in a building located at 80 Leonard street, in the city of New York, where it occupied the basement, ground floor, and second floor rooms, each being approximately 40 by 180 feet in size. The first floor was devoted to its executive, accounting, and sales offices; the basement was used for the storage of sample cases of various kinds of its merchandise; and the second floor was used for a sample room and stockroom. Deliveries of more than 90 per cent. of the plaintiff's sales for export as well as for domestic consumption were made direct from the finishing mill's warehouse, and less than 10 per cent. of deliveries on such sales were made from the plaintiff's own storeroom. The plaintiff also maintained a number of small salesrooms in various cities throughout the United States. Approximately one-half of its force of more than forty salesmen, practically all of whom worked on a commission basis, were employed in the city of New York.

6. At or about the close of its fiscal year ending June 30, 1920, the plaintiff caused a complete physical inventory to be made of its entire stock of goods.

The 97 items of merchandise listed in the plaintiff's inventory of June 30, 1920, consist of finished merchandise, goods in process, and gray goods. The items listed under the column headed "State of fabrics" as "gray"

consisted of gray goods which the weaving mills had completed and were holding subject to plaintiff's instructions. The items listed as "In process" consisted of all cloth which had been shipped from the weaving mills to the finishing mills, but which had not yet been invoiced to the plaintiff by the finishing mills. The items listed as "Finished" included merchandise which had been finished and invoiced by the finishing mills to the plaintiff and which was located either in the finishing mills' warehouses or in the plaintiff's store-room. The plaintiff's inventory of June 30, 1920, priced at cost showing the merchandise on hand having a total value of $621,180.13, was arrived at by adding together the cost per yard of the gray goods, in accordance with the contract with the gray goods mills and the price actually paid therefor, the finishing costs, in accordance with the invoices from the finishing mills, the allowance for working loss, and the freight and boxing charges. The last three items constituted but a small fractional part of the aggregate cost. The plaintiff's costs of finishing, freight, and boxing of the items listed on its June 30, 1920, inventory on a per yardage basis are set forth under the column headed "Finishing, freight, and cases" in plaintiff's Exhibit No. 19 now on file herein.

If the plaintiff is entitled to inventory valuation on the basis of market, then the market value of plaintiff's inventory on or about June 30, 1920, was $341,484.21.

7. On September 13, 1920, plaintiff duly filed with the collector of internal revenue of the Second district of New York, at New York, N. Y., a tentative return of its income and invested capital for the fiscal year ending on June 30, 1920, on the forms furnished by the Commissioner of Internal Revenue; and at the said time and place duly filed with the said tentative return a request that the time for filing the completed return be extended to November 15, 1920, which said request was granted.

8. On or about November 11, 1920, the plaintiff prepared and duly filed with the collector of internal revenue of the Second district in New York, at New York, N. Y., its completed return of its net income and invested capital for the fiscal year ending June 30, 1920, on the forms furnished by the Commissioner of Internal Revenue.

9. In said tax return the plaintiff stated the value of its inventory on June 30, 1920, to be $621,180.13, and its invested capital to be $833,275.62; and its net income for income and excess profits tax purposes to be $623,534.70; and, applying the rates, calculations, and adjustments provided for in the aforesaid act to the figures shown in said return, the income and excess profits taxes of the plaintiff were stated to be $244,088.87.

10. On or about August 24, 1925, the Commissioner of Internal Revenue revised the invested capital and the net income of the plaintiff, and reduced said invested capital from $833,275.62, as stated in said return, to $832,667.64, and reduced said net income from $623,534.70, as stated in said return, to $609,569.32, and the Commissioner determined the income and excess profits taxes of the plaintiff for the fiscal year ending June 30, 1920, to be the sum of $237,695.44. The said revision of invested capital and said reduction of net income were made upon a basis and for reasons other than those on which this action is based.

11. The said sum of $237,695.44 was duly paid by the plaintiff to the collector of internal revenue for the Second district of New York, at New York, N. Y., on the following dates and in the following amounts:

Paid September 18, 1920.......$  60,000.00
Paid November 13, 1920.......   1,022.22
Paid December 21, 1920.........  61,022.22
Paid March 18, 1921...........   61,022.22
Paid July 5, 1921..............   41,845.84
Paid December 31, 1925........      817.46
Credit of 1917 overassessment on
   October 22, 1925.............   5,171.38
Credit of 1918 overassessment on
   October 22, 1925.............   3,710.95
Credit of 1919 overassessment on
   October 22, 1925.............   3,083.15
     Total ...................$237,695.44

The whole of said sums was duly turned over and paid to the United States by the collector in the usual course of his business as such collector.

12. Schedule A-2 of the United States Internal Revenue Service Form 1120 used by the plaintiff in the making of its corporation income and profits tax return for the period begun July 1, 1919, and ended June 30, 1920, required that:

"Inventories must be valued at (a) cost or (b) cost or market, whichever is lower, provided that whichever basis is used must be applied to each item in the inventory and not a part only. Inventories at the end of the taxable period must be valued on the same basis as those at the end of the preceding taxable period, unless permission to make a change has been first obtained from the commissioner."

13. The year 1920 witnessed a chaotic situation in the cotton goods industry. The prices of cotton goods had begun to advance in the early spring of 1919, and that advance had continued steadily and rapidly throughout the remainder of the year 1919 and until March and the forepart of April, 1920, when the prices attained were the highest reached since the Civil War. The mills were producing goods to the full extent of their capacities, and the demand for cotton fabrics greatly exceeded available supplies. The rise in prices was arrested in the latter part of April following the financial troubles in Japan with the attendant disruption and disorganization of the silk industry. The market at that time became dull. During the month of May the cotton goods business slowed up very perceptibly, and on a comparatively dull market prices began to weaken. The plaintiff's particular field in the cotton goods industry was adversely affected by the changing conditions, which in June were marked by declining prices, the curtailing of production by mills, the cancellation of orders, and return of merchandise by customers, and by their endeavors to reduce their stocks through resale of their merchandise, thereby weakening the market price therefor. The low price levels which were reached in December, 1920, obtained until after the first quarter of 1921, when substantial purchasing power again came into the market and a gradual advance in prices began.

14. On September 15, 1925, the plaintiff filed a claim for refund of income and excess profits taxes for the fiscal year ended June 30, 1920, in the sum of $1,000, or such greater amount as was legally refundable, and stated therein that:

"This claim for refund is made and requested, that in a revision of our records certain items have been disclosed that should have been omitted from the return for the period ending June 30, 1920. Complete examination is now being made and conference is respectfully requested, so that such briefs and arguments may be submitted as to substantiate our claim. Brief will be filed within the next 60 days to substantiate this claim."

15. On March 31, 1928, the plaintiff filed a claim for refund of income and excess profits taxes for the fiscal year ended June 30, 1920, in the sum of $150,000, or such greater amount as was legally refundable, and stated therein:

"This claim for refund is made in accordance with the provisions of section 284, paragraph (g), of the Revenue act of 1926, and is based upon the following facts:

"1. The corporation's invested capital for the taxable year ended June 30, 1920, has been understated by reason of Federal income and excess profits taxes refunded for the taxable years 1917, 1918, and 1919.

"2. The net income of the corporation for the taxable year ended June 30, 1920, has been overstated by reason of an overstatement of its inventory at June 30, 1920, which comes about by erroneous pricing of the items in stock.

"A brief will be filed within a period of sixty days setting forth all the contentions, together with copies of claims heretofore filed."

16. On September 15, 1925, the claim for refund referred to in finding 14 hereof along with a waiver, a copy of which is hereinafter set out, and a letter addressed to the collector of internal revenue, customhouse, New York City, N. Y., were duly signed by the plaintiff and transmitted by messenger to the office of the collector of internal revenue in the customhouse in New York City. The said waiver is as follows:

"In pursuance of the provisions of the existing internal revenue laws, Bedford Mills, Inc., a taxpayer of New York City, New York, and the Commissioner of Internal Revenue hereby waive the time prescribed by law for making any assessment of the amount of income, excess-profits, or war-profits taxes due under any return made by or on behalf of said taxpayer for the year ended June 30, 1920, under the existing revenue acts or under prior revenue acts.

"This waiver of the time for making any assessment as aforesaid shall remain in effect until September 15, 1926, and shall then expire except that if a notice of a deficiency in tax is sent to said taxpayer by registered mail before said date and (1) no appeal is filed therefrom with the United States Board of Tax Appeals then said date shall be extended sixty days, or, (2) if an appeal is filed with said board then said date shall be extended by the number of days between the date of mailing of said notice of deficiency and the date of final decision by said board."

17. A year later, September 15, 1926, a second waiver was prepared and duly signed by the plaintiff, and was, along with a letter of transmittal, delivered by messenger to the office of the collector of internal revenue, customhouse, New York City, N. Y. That waiver is as follows:

"In pursuance of the provisions of existing internal revenue laws, Bedford Mills, Inc., a taxpayer of New York City, New York, and the Commissioner of Internal Revenue hereby waive the time prescribed by law for making any assessment for the amount of income, excess-profits, or war-profits taxes due under any return made by or on behalf of said taxpayer for the year ended June 30, 1920, under the existing revenue acts or under prior revenue acts.

"This waiver of the time for making any assessment as aforesaid shall remain in effect until April 1, 1928, and shall then expire except that if a notice of deficiency in tax is sent the said taxpayer by registered mail before said date and (1) no appeal is filed therefrom with the United States Board of Tax Appeals then said date shall be extended sixty days or, (2) if an appeal is filed with said board then said date shall be extended by the number of days between the date of mailing of said notices of deficiency and the date of final decision by said board."

18. On or about February 27, 1926, the following letter was addressed to the plaintiff by the Commissioner of Internal Revenue, and was received by the plaintiff on or about that same date:

"Your claim for the refund of $1,000 income and profits tax for the fiscal year ended June 30, 1920, has been examined.

"Your claim is based upon the statement that, 'In a revision of our records certain items have been included that should have been omitted from the return for the period ending June 30, 1920. Complete information is now being mailed and conference is respectfully requested so that such briefs and arguments may be submitted to substantiate claim. Brief will be filed within the next sixty days to substantiate this claim.'

"There is no record in this office of brief filed to complete the above claim. Inasmuch as no information has been submitted in substantiation of the claim, the same is rejected.

"The rejection of the above amount will officially appear upon the next schedule to be approved by the commissioner."

The Commissioner of Internal Revenue did not send or deliver to plaintiff any other letter or notice concerning the aforesaid claim for refund filed on September 15, 1925.

The schedule showing the rejection of the claim was signed by the Commissioner of Internal Revenue on March 13, 1926.

19. On or about October 23, 1928, the Commissioner of Internal Revenue addressed a letter to plaintiff denying the plaintiff's aforesaid claim for refund referred to in finding 15 hereof.

20. On or about March 25, 1929, plaintiff duly filed with the clerk of this court its petition herein, and on or about November 26, 1929, plaintiff filed with the clerk of this court its amended petition.

21. The plaintiff has at all times borne true allegiance to the government of the United States, and has not in any way voluntarily aided, abetted, or given aid or encouragement to rebellion against said government. It is the sole and absolute owner of the claim herein presented, and it has made no transfer or assignment of said claim or any part thereof.

John F. Hughes, of New York City, for plaintiff.

George H. Foster, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen. (Eldon O. Hanson, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and WHALEY, WILLIAMS, LITTLETON, and GREEN, Judges.

BOOTH, Chief Justice.

This is a suit brought by the Bedford Mills, Inc., a New York corporation, to recover an alleged overpayment of income and excess profits taxes paid by plaintiff upon its return filed for the fiscal year ending June 30, 1920. The facts are as follows:

The plaintiff is engaged in the business of converting cotton goods into a finished product which it sells to jobbers and manufacturers. Plaintiff orders from certain cotton mills cotton fabric known to the trade as "gray goods," and thereafter contracts with other mills for the dyeing, printing, and finishing of the same into desired textures, colors, and patterns for sale to its customers.

The plaintiff, acting under authorized extensions of time for filing its tax return, filed it on November 11, 1920. This return disclosed a tax liability of $244,088.87. Thereafter, on August 24, 1925, the Commissioner of Internal Revenue revised the invested capital of the plaintiff and reduced its tax liability to $237,695.44, which amount was duly paid in installments.

On September 15, 1925, and again on March 31, 1928, the plaintiff filed appropriate refund claims seeking a refund of a large portion of the taxes paid as above, the refund claims being filed under the provisions of section 284(g) of the 1926 Revenue Act (44 Stat. 67 [26 USCA § 1065(g)]), plain-

tiff having executed and filed the necessary waivers exacted by the act. Thereafter, on March 25, 1929, the Commissioner denied the refund claims, and this suit was brought on November 26, 1929, disposing, we think, of all jurisdictional issues raised by the defendant.

Plaintiff's tax return, made upon a fiscal year basis, valued its inventory of June 30, 1920, at $621,180.13. This valuation was reached by ascribing to the articles inventoried their cost price. The year 1920 developed a changing condition with respect to the market for cotton goods. Until some time in April, 1920, the market steadily advanced and prices attained their peak. The demand was excessive and the mills busy. Beginning in the latter part of April, and continuing, the industry suffered a serious and rapid decline in market conditions and values due to the financial troubles in Japan. Plaintiff's selling market was seriously interrupted, and the demand for its products, as well as price levels, declined very materially, and this condition existed until early in 1921. During this period the market value of the articles inventoried by the plaintiff was much less than cost.

Plaintiff's refund claim filed March 31, 1928, in so far as pertinent to the issue involved in this case, was predicated upon an overstatement of its inventory value, brought about by an alleged erroneous pricing of its items in stock, plaintiff contending that under the regulations of the Commissioner then in force it possessed the legal option to value its inventory at "cost or market, whichever is lower," and that, inasmuch as the proof conclusively establishes that the market price was the lower, plaintiff is entitled to have its tax liability computed upon an inventory value of $253,032.31 instead of the erroneous one of $621,180.13. The commissioner of the court, after hearing all the testimony, fixed the value of plaintiff's inventory of June 30, 1920, at $341,484.21.

The first sentence of the second paragraph of article 1582, Regulations 45, Valuation of Inventories, provides as follows: "The basis of valuation most commonly used by business concerns and which meets the requirements of the revenue act is (a) cost or (b) cost or market, whichever is lower."

Article 1584, Regulations 45, Inventories at Market, is in the following language:

"Art. 1584. *Inventories at Market.*—Under ordinary circumstances, and for normal goods in an inventory, 'market' means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases (a) of goods purchased and on hand, and (b) of basic elements of cost (materials, labor and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, which goods must be inventoried at cost. Where no open market exists or where quotations are nominal due to stagnant market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices, less proper allowance for selling expense, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market. It is recognized that in the latter part of 1918, by reason among other things of governmental control not having been relinquished, conditions were abnormal and in many commodities there was no such scale of trading as to establish a free market. In such a case, when a market was established during the succeeding year, a claim may be filed for any loss sustained in accordance with the provisions of section 214 (a) (12) or section 234(a) (14) of the statute. See articles 261–268."

The case turns upon whether the plaintiff is to be classified as a trader under (a) of the above regulation, or as a manufacturer under (b). If the plaintiff's business is of such a character as to bring it within the same category as a trader who purchases finished merchandise for sale, and in the course of his activities maintains a stock of such a character on his shelves, then its inventory value may be priced at cost or market, whichever is lower. If, on the contrary, the plaintiff's business is to be likened to and classified as a manufacturer, one who converts raw materials into a finished product, then under the

regulations long in force the inventory must be priced at the cost or market value, whichever is lower, of the "basic elements of cost (materials, labor and burden) in goods in process of manufacture and in finished goods on hand." The plaintiff not only argues that a trader status is clearly ascribable to it, but insists that under any circumstances it is entitled to value its inventory at cost or market, whichever is lower, on the date of its taking, rather than its reproductive value; that the regulations do not contemplate a "built-up or theoretical market value to a manufacturer as distinguished from a trader."

To sustain the last contention of the plaintiff would, we think, exact of the court an opinion as to reasonableness and lawfulness of the regulations under which the plaintiff's tax liability is to be determined. This issue we regard as no longer res integra. The use of inventories in ascertaining correct income, the circumstances under which they must be used, the manner of their taking, and the basis of valuation thereof, together with the numerous other details concerned in their preparation, are provided for by the Commissioner in extensive, plain, and lengthy regulations, and the courts have uniformly sustained the regulations. It is, we think, too late to indulge another academic discussion as to whether they conform "to the best accounting practice in the trade or business and as most clearly reflecting the income." Riverside Mfg. Co. v. United States, 67 Ct. Cl. 117; Chicago Frog & Switch Co. v. United States, 67 Ct. Cl. 662; United States v. Kemp (C. C. A.) 12 F.(2d) 7; Lucas v. Kansas City Structural Steel Co., 281 U. S. 264, 50 S. Ct. 263, 74 L. Ed. 848.

The plaintiff was what is known in the trade as a "converter of cotton goods." The plaintiff's business enterprise undoubtedly required it to convert raw material into a finished product. As a matter of fact, two processes of manufacture or conversion were essential to bring it into merchantable form, the single source from which it derived income. The finished product was not transferred to plaintiff's established place of business in New York, but shipped direct to its customers from the finishing mills, where it was stored in warehouses of the mills awaiting shipping orders. It is true the plaintiff incurred no factory overhead, and neither owned nor possessed any mills, but this we think a nonessential factor. The merchandise of the plaintiff was made especially for it, designed by it, and given by it an individual trade character. The plaintiff, and the plaintiff alone, was responsible for the conversion, the manufacture of certain raw material into a finished product, and it is conceded that the finished product and the work and material necessary to produce it, as well as each process employed so to do, were done exclusively for the plaintiff.

The plaintiff cites numerous cases to sustain its position that it is not a manufacturer. We have examined them, and the general principle upon which they rest is, we think, in no sense applicable here. Where one buys an autotruck and changes its form in some particular, assuredly he is not a manufacturer of an autotruck. A brewer importing cork from Spain who applies to it a process of shaping it to meet the needs of the industry is obviously not a manufacturer of corks. As said by the Supreme Court in Anheuser-Busch Brewing Association v. United States, 207 U. S. 556, 562, 28 S. Ct. 204, 206, 52 L. Ed. 336:

"Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in Hartranft v. Wiegmann, 121 U. S. 609, 7 S. Ct. 1240, 30 L. Ed. 1012. There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'"

The plaintiff maintained no mercantile establishment, in the sense used in the Commissioner's regulations as applicable to a trader; i. e., one who buys and sells a finished product or products. The plaintiff's activities apparently embraced the "transformation" of raw material into a different article "having a distinctive name, character, or use," and, while its business is not fraught with all the incidents of a manufacturer, there is nothing in the way of valuing its inventory in compliance with the regulations relating to manufacturers. There are many manufacturers who do not themselves make all the elements that go into their finished products, but have them made by others. The test, as we view it, is not confined altogether to the manner of conversion, but rather to the fact that one manufactures an article of distinct identity by converting or transforming raw materials into an article which the maker uses as a source of income and profit.

If A conceives the possibility of applying to gray goods a finishing process which will convert the rough, unfinished gray goods into an article of commerce different from ordinary gray goods, and, in virtue of such an

idea a new form of textile is placed upon the market, it seems to us that A is as much a manufacturer under the tax law as if he himself performed the physical labor of creating the product. It is true, generally speaking, we would say B and C, whose combined efforts produced the finished product, are the manufacturers, but we are dealing with the proper and prescribed basis for ascertaining the value of the product for federal tax purposes under regulations of the Commissioner of Internal Revenue which have been approved and upheld by the courts. The court must under the facts classify the taxpayer, and if from them it appears that the taxpayer produces the article which he sells, we cannot escape the conclusion that he falls within (b) of article 1584, Regulations 45.

The taxpayer having failed to establish facts sufficient to compute his tax liability under the regulations, the petition will have to be dismissed. It is so ordered.