SPACE CONTROLS, INC., Petitioners,
v.
COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 19818.

United States Court of Appeals
Fifth Circuit.

Aug. 8, 1963.

Jones, Circuit Judge, dissented.

Leland E. Fiske, Dallas, Tex., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Richard J. Heiman, Attys., Dept. of Justice, Crane C. Hauser, Chief Counsel, John M. Morawski, Atty., Internal Revenue Service, Joseph Kovner, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

█ This appeal from the Tax Court has to do with inventories and the use of the lower of cost or market option. As the manufacturer-Taxpayer sees it, the question is whether the Taxpayer is "entitled to a deduction in the fiscal year ended February 28, 1957, for the amount by which the cost of materials and work in process for [a specific Government contract], in inventory at the end of the fiscal year, exceeded the selling price

which would be received for these items under the contract, when they were delivered" in the following year. The Government phrases the question quite differently to be "whether a future estimated loss on a manufacture and sales contract can be taken as a current loss in the inventory value of raw materials, work in process, and finished articles not yet delivered." The difference in statement is more than semantics. We emphasize it at the outset since we are convinced that neither in purpose nor effect is the reduction in inventory value the anticipation of a loss not yet realized. The case, therefore, is not really the one which the Government's question poses. We agree substantially with Taxpayer and reverse and remand for the necessary adjustments.

The facts are either stipulated or uncontradicted. Accepting all fact findings of the Tax Court, we differ only in the ultimate conclusions reached. The specific tax issue is whether Taxpayer is entitled to an inventory write-down for the fiscal year ending February 28, 1957. No dispute exists that the contract was unprofitable and produced a loss. The question is whether this was, as Taxpayer claims, an inventory loss in fiscal year 1956 or, as the Government contends, fiscal 1957 (year ending February 28, 1958).[1] The critical inventory date is February 28, 1957.

Taxpayer is a Texas manufacturer. In June 1956, it was awarded a contract with the Government for construction and delivery of 382 military light cargo trailers at a unit price of $804.2175, a total contract price of $307,211.09. This was designated by Taxpayer as its job No. 1120. The trailers were of a special military design and were not suitable for commercial or civilian use. Apart from the contract, their market value would be for scrap alone. As of February 28, 1957, a total of 96 units had been completed and shipped. The remaining 286 units were shipped during

1. As usual, the issue arises obliquely, the Taxpayer seeking a net loss carry back to 1955, the Government allowing it for only a fractional part of that year.

the period March 1, 1957 through July 31, 1957. Substantially all of the material for the completion of the contract had either been acquired or ordered by February 28, 1957. As was the finished product, this material was specially ordered for the job and was not suitable for use on Taxpayer's other contracts. It is uncontradicted that Taxpayer would not "have been able to sell these materials profitably to" anybody else. In terms of the proportion of equivalent units completed [2] and the proportional percentage of costs incurred,[3] the contract was substantially completed as of February 28, 1957.

Taxpayer's inventories on hand pertaining to this trailer contract taken at cost and consisting of materials, direct labor, overhead and work in process totaled $194,209.49.[4] In its tax return for year ended February 28, 1957, as well as in the financial audit statement prepared by these accountants, inventory was written down from cost ($194,209.49) to market ($91,195.34) through adjustments total $103,014.15.[5] In reducing closing inventory, there was a like increase in cost of goods sold with a consequent decrease in taxable income.

The Commissioner disallowed the write-down of $103,014.15, the conse-

2. Taxpayer's certified public accountants, whose professional competence, judgment and opinions are in no way questioned by the Tax Court, determined that at February 28, 1957, the number of equivalent units which had been completed was as follows:

|  | | Total Units | Percent Completion | Equivalent to Finished Units |
|---|---|---|---|---|
| (a) Units shipped | | 96 | 100% | 96. |
| (b) On hand | | | | |
| Finished | 12 | | | |
| 80% | 2 | | | |
| 75% | 2 | 16 | 94.5 | 15.1 |
| (c) 50% Completed | | 1 | 50 | .5 |
| (d) Components | | 160 | 41 | 65.6 |
| | | | | 177.2 |

3. The accountants determined that 68.14% of total costs had been incurred.

| | |
|---|---|
| Costs already incurred | $305,992.85 |
| Estimated future costs | 138,811.77 |
| | $444,804.62 |

The estimate for future costs was remarkably accurate. Actual costs per job cost ledger were $140,363.88, as adjusted by the accountants $143,073.16.

4.

| | |
|---|---|
| (a) Raw materials | $ 99,893.56 |
| (b) Work in process | 94,315.93 |
| | $194,209.49 |

5. As a part of inventory this was done through these steps:

| | | |
|---|---|---|
| Raw materials @ cost | | $99,893.56 |
| Goods in process | | |
| @ cost | $94,315.93 | |
| less | 29,174.11 | |
| Market value | | 65,141.11 |
| | | $165,035.38 |
| Less: Est. loss on completion contract | | 73,840.04 |
| | | $ 91,195.34 |

quence being to decrease cost of goods sold by a like amount.[6] The Tax Court did several things. First, as to inventory not in process, it sustained the Commissioner and disallowed the write-down on the ground that the Taxpayer had "failed to carry" the burden of establishing "that the market value of its inventory of materials not in process is less than its cost." Second, as to work in process, it likewise held there was "insufficient evidence * * * with respect to [Taxpayer's] in-process inventory to show what the fair market value thereof might be." Third, with respect to the 12 finished trailers and the four others which were 75–80% completed (note 2, supra, Item (b)), it held that they were "sufficiently complete to be in salable form" and were all in a "salable state * * * with a cost of $360.20 in excess of the market value thereof." Consequently as to these 16 finished items, it allowed an inventory write-down.[7] The Taxpayer appeals from the first and the Government cross appeals from the second.

In making these adjustments, the accountants determined that the cost of manufacturing these trailers would amount to $1,164.41 per unit.[8] This produces a loss on each unit of $360.20. The Tax Court accepted both of these figures.[9]

In assaying the correctness, either of the Tax Court's reasoning or the result.

it simplifies matters to point out that Taxpayer does not now seek to justify any deductions for "estimated future cost of completing the contract" amounting to $73,840.04 as originally made on the return. The Taxpayer's brief states that Taxpayer "is conceding that no future costs should be considered" and "only actual cost incurred prior to" February 28, 1957, are now being taken into account. This is not exactly so, for on the revised computations based upon the proportion of expenses incurred and receipts earned, the percentage of completion, of costs, and sales receipts in the year ending February 28, 1957, Taxpayer necessarily has to consider the percentages (either actual or estimated) for like factors for the succeeding year ending February 28, 1958. As near as we understand these computations, this produces a proper decrease in inventory of approximately $60,000.[10]

In supporting the Tax Court's complete disallowance of the write-down (except as to the 16 finished units), the Government makes two principal contentions. The first is that allowance of a write-down is in effect the tax recognition of a loss not yet incurred in fact and thus it offends the time-honored principle of annual accounting for tax purposes. The second is that under the Regulations, the term market, as used in

---

6. The deficiency notice asserted Taxpayer had "not shown that the 'market value' of 'work in process' was less than your cost of $94,315.93" (see note 5, supra) so closing inventory was increased by $29,174.11 (see note 5, supra). As to the remainder, it stated "In addition you have not shown that a reserve of $73,840.04 included in the cost of goods sold is deductible under any section" of the Revenue Code.

7. Work in process at cost (see note 4, supra) $94,315.93
Excess of cost over market 16 X $360.20 5,763.20
$88,552.73

8. The actual costs turned out to be $1,175.57 per unit (see note 3, supra).

There is a slight difference in percentage of recovered costs:

| | Cost | Percent of Costs Recovered |
|---|---|---|
| Estimated | $1,164.41 | 69.066% |
| Actual | 1,175.57 | 68.79 |

9. The Court stated: "With respect to the 12 finished trailers in inventory at February 28, 1957, we believe the evidence is clear that [Taxpayer's] market price therefore was $804.21. We believe the cost of these finished trailers which is computed by [Taxpayer's] accountant to be $1,164.41 each is reasonably accurate."

10. On the basis of the estimated completion cost of $1,164.41 per unit, it would be $60,084.32. If actual cost of $1,175.50 per unit) is used, the write-down would be $62,080.73. For our purposes we accept these figures without ascertaining their intrinsic correctness.

the lower-of-cost-or-market formula, relates not to what the manufacturer receives on the *sale* of its product (or components), but what it *pays* in the purchase of the raw materials and the "purchase" of direct costs, such as labor, burden, etc.

■■ As to the first, we do not question the principle of annual accounting, or the numerous classic cases urged by the Government in its support.[11] There are two reasons, at least, why this principle is not determinative in this case. At the outset, it really begs the question for it assumes that no loss is incurred until the last trailer is delivered and paid for. That is an unfounded assumption as later discussion demonstrates. In the second place, and more important, the use of lower of cost or market inventory is in reality a limited exception to the principle of annual accounting. The Sixth Circuit has phrased it this way. It is " * * * well recognized that the method of valuing inventory at the lower of cost or market is an instance where the tax law permits the deduction of an unrealized loss, and is a recognized exception to the necessity of reflecting in income tax returns only closed transactions." Sharp v. Commissioner, 6 Cir.,

1955, 224 F.2d 920, 924. Somewhat differently, the Second Circuit has said: "The determination of the value to be placed upon an inventory has no relation to the principle or theory affecting the determination of *when* income is deemed to be received and when expenses are deemed to be incurred." American Can Co. v. Bowers, 2 Cir., 1929, 35 F.2d 832, 835. The validity of this is illustrated by considering the simplified case of a trader in a commodity, such as fuel oil, which has a readily ascertainable, lively market. Though stock on hand procured earlier at a greater cost will not be sold and the loss thereby "realized" until the succeeding year, it is plain that it may be written down at the year's end to reflect the market price. This is true even though in fact no "loss" ever occurs because of an intervening subsequent rise in market value.[12]

■■ The second contention relating to the Regulations brings us to the heart of the case. Contrary to the Government's view, we think that the Regulations sustain the Taxpayer's approach. The Statute [13] expressly contemplates dependence on Regulations thereby investing wide scope and validity in the administrative regulations. As we shall

---

11. Of the many the Government cites these: Lucas v. Ox Fibre Brush Co., 1930, 281 U.S. 115, 50 S.Ct. 273, 74 L.Ed. 733; Lucas v. American Code Co., 1930, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538; Weiss v. Wiener, 1929, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720; United States v. Anderson, 1926, 269 U.S. 422, 46 S. Ct. 131, 70 L.Ed. 347; Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326; cf. Commissioner of Internal Revenue v. Milwaukee & Suburban Transport Corp., 1961, 367 U.S. 906, 81 S.Ct. 1917, 6 L.Ed.2d 1249, reversing 7 Cir., 1960, 283 F.2d 279; United States v. Texas Mexican Ry., 5 Cir., 1959, 263 F.2d 31.

12. The Tax Court in D. Loveman & Son Export Corp., 1960, 34 T.C. 776, 798, quoted from Finney & Miller, Principles of Accounting (Intermediate), 5th Ed. 1958, p. 251: "The cost-or-market basis of inventory pricing conforms with an old rule of accounting conservatism often stated as follows: anticipate no profit and provide for all possible losses."

Likewise, see Restatement and Revision of Accounting, Research Bulletins, American Institute of Accountants, Bulletin 43, 1953, Ch. 4, Inventory Pricing, Statement 5: "A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as *market*."

13. "§ 471. General rule for inventories.
"Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting

later see, the term inventory as administratively defined is significant.[14] The Regulations echo the statutory emphasis on inventory methods "conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." 26 U.S.C.A. § 471; Regulation § 1.471–2.[15] Considering the sharply defined rule that accounting may be different for business-financial purposes and for tax purposes, the Regulations here accord extraordi-

nary tax significance to financial accounting of inventories. "An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income." Regulation § 1.471–2(b).[16] The Regulations recognize two principal bases, (1) cost and (2) "cost or market, which ever is lower." § 1.471–2(c). Necessarily they define cost, § 1.471–3, [17] and "cost or market,

practice in the trade or business and as most clearly reflecting the income." 26 U.S.C.A. § 471.

14. Treasury Regulation § 1.471–1. "In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, * * * if title thereto will pass to the purchaser of the product to be sold therein * * *."

15. Treasury Regulation § 1.471–2 Valuation of inventories.

"(a) Section 471 provides two tests to which each inventory must conform:

"(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

"(2) It must clearly reflect the income. "* * *

"(c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost of market, which ever is lower. (For inventories by dealers in securities, see § 1.471–5.) Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price

means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.

"(d) * * * Taxpayers were given an option to adopt the basis of either (1) cost or (2) cost or market, whichever is lower, for their 1920 inventories. The basis properly adopted for that year or any subsequent year is controlling, and a change can now be made only after permission is secured from the Commissioner. Application for permission to change the basis of valuing inventories shall be made in writing and filed with the Commissioner as provided in paragraph (e) of § 1.446–1. * * *

"* * * *."

16. See Aluminum Co. of America v. United States, W.D.Pa., 1938, 24 F.Supp. 811; 2 Mertens, Federal Income Taxation, § 16.05 (1961).

17. Treasury Regulation § 1.471–3 Inventories at cost.

"Cost means:

"(a) In the case of merchandise on hand at the beginning of the taxable year, the inventory price of such goods.

"(b) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods.

"(c) In the case of merchandise produced by the taxpayer since the beginning of the taxable year, (1) the cost of raw materials and supplies entering into or consumed in connection with the prod-

whichever is lower." § 1.471–4.[18] Taxpayers have been given an option to adopt the basis of either (1) cost or (2) cost or market, whichever is lower, for their inventories. Once the basis is properly adopted, a change can only be made with the permission of the Commissioner. § 1.471–2(d).

Before discussing the two provisions we regard of crucial significance, it will be helpful to point out briefly that, contrary to the Government's thesis that market concerns *purchases for* inventory, not *sales from* it, the Regulations make the sales price significant in a number of instances. See, for example, goods which are "unsalable at normal prices or unusable in the normal way," § 1.471–2 (c), and the use of "specific purchases or sales by the taxpayer or others * * *" as evidence of a fair market price where "no open market exists or quotations are nominal * * *." § 1.471–4(b).

The Taxpayer makes a formidable showing based especially on the sound decision of the Tax Court in McKay Machine Co. (1957), 28 T.C. 185, that under the circumstances of this case the goods in the inventory were "unsalable at normal prices or unusable in the normal way * * *" so that they "should be valued at bona fide selling prices less direct cost of disposition * * *." § 1.471–2(c). The Government argues that this is not available since unsalability or unusability must be due to "damage, imperfections, shop wear, changes of style, odd or broken lots, * * *." It then points out that these trailers, while lacking general marketability, were certainly salable since they were being produced under a firm contract. Likewise, while "unusable in the normal way" in the sense of lacking ordinary non-military utility, they were, so far as we know, being manufactured in a proper way to perform their intended function. Consequently, it continues, relief could not be obtained under the subsequent clause "or other similar causes."

But the Tax Court took no such restrictive view in McKay. There the tax-

---

uct, (2) expenditures for direct labor, (3) indirect expenses incident to and necessary for the production of the particular article, including in such indirect expenses a reasonable proportion of management expenses, but not including any cost of selling or return on capital, whether by way of interest or profit. " * * *."

18. Treasury Regulation § 1.471–4 Inventories at cost or market, whichever is lower.

"(a) Under ordinary circumstances and for normal goods in an inventory, 'market' means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases—

"(1) Of goods purchased and on hand, and

"(2) Of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i.e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost.

"(b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market.

"(c) Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article."

payer constructed a special machine under a firm contract with the Russian Government, but it could not obtain an export license. It wrote down its inventory to the estimated selling price of the material which could be sold or salvaged. This adjustment was held valid. Even though the machine was presumably well manufactured and fully capable of operating as intended, the Court took a practical view since "there was no market for the mill as such." The Court went on to state that "the market or realizable value of component parts was less than their cost as carried in the inventory. Such parts thus were similar to obsolete or damaged merchandise." The Court then concluded "that the proper method of accounting for such merchandise by a taxpayer employing inventories is to reduce closing inventory to reflect its value. * * *" 28 T.C. 185 at 194. This approach was long ago indicated in Lucker v. United States, Ct.Cl., 1931, 53 F.2d 418, 424. "Taxation is eminently practical, and we think this is particularly true as to inventories which need only conform to the 'best accounting practice in the trade or business and as most clearly reflect the income.' "

■ We need not pass on the sufficiency of § 1.471–2(c) to justify the Taxpayer here. For without rejecting it and certainly without rejecting the force of McKay, we think that § 1.471–4(b) is a complete justification. At the outset, in the structure of the Regulation, this is a part of the section dealing specifically with inventories at cost or market, whichever is lower. Necessarily, it is dealing then with inventories made up of raw materials and goods in process to which the option is applicable. § 1.471–4(a) (2). Next, paragraph (b) affirmatively prescribes the exceptions to the standard established under paragraph (a) which defines "market" as "the current bid price * * * for the particular merchandise in the volume in which usually purchased by the taxpayer * *." The first situation giving rise to the exception of paragraph (b) is the absence of a reliable, active market. The second situation is covered under the remainder of paragraph (b). It provides: "Where the taxpayer in the regular course of business has offered for sale such *merchandise* at prices lower than the current price as above defined, the *inventory* may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. * * *." (emphasis supplied) (see note 18, supra)

The Taxpayer's theory satisfies both the letter and the spirit of this Regulation. The contract calling for manufacture, sale and delivery of the trailers was "in the regular course" of its business. It is now conceded, indeed the Tax Court found, that the price for which Taxpayer had "offered for sale such merchandise" was $360.20 "lower than the current price as above defined." The "current price as above defined" both as to finished goods on hand (16 trailers) and goods in process included the "basic elements of cost" comprising materials, labor, and burden. Whether these are to be determined on "replacement" or "reproductive" costs,[19] the record is uncontradicted and the Tax Court has found that such costs exceeded by $360.20 the realizable sales price. Likewise this treatment conforms to the best accounting practice which, both by statute and regulation, is the generally accepted standard.[20] See notes 13 and 15.

19. The Government's brief referring to this (p. 10) takes a neutral position as to whether § 1.471–4(a) (2) means "replacement or reproduction costs." It does not choose sides in the controversy between the Tax Court (and its predecessor Board) and the Treasury Department, on the one hand, and the Court of Claims on the other. See 2 Mertens, Federal Income Taxation, § 16.22 (1961); G.C.M. 9401, X–1 Cum.Bull. 102 (1931); Bedford Mills, Inc. v. United States, 1932, 59 F.2d 263, 75 Ct.Cl. 412; D.C., 1933, 2 F.Supp. 769, cert. denied, 1933, 290 U.S. 655, 54 S.Ct. 71, 78 L.Ed. 567.

20. Taxpayer's accountant testified to the uncontradicted professional opinion that

■ The Government's brief contends that despite its plain language this Regulation is simply not applicable. Rather, it asserts, this Regulation applies only to a "fairly clear situation where the taxpayer is offering merchandise for sale in substantially the same form as it would be purchased in the current market." (Govt. Brief p. 13) But this argument overlooks the purposeful use of the separate terms "merchandise" and "inventory" in § 1.471–4(b). This whole section is dealing with finished goods and goods in process. Constructed to meet practical problems, the Regulation certainly did not contemplate that to get the benefit of paragraph (b) the taxpayer must have offered goods in process for sale in their incompleted state at prices lower than cost. The Regulation deliberately used the term "merchandise" which would mean the finished product. But the Regulation did not then proceed to limit the benefit of paragraph (b) to inventory insofar as it was represented in such "merchandise." Rather, the Regulation itself states that in such event "the *inventory* may be valued at such [sales] prices less direct cost of disposition." This brings in as highly significant the general definition of inventory found in § 1.471–1 (note 14, supra). The term inventory "should include all finished or partly finished goods * * *" the latter being, of course, the equivalent of goods in process.

This is essentially the approach taken by the Tax Court in the recent case of Ernest, Holdeman & Collet, Inc., P-H Memo T.C. #60,010. The taxpayer was a dealer in new and used machine tools. Its inventory consisted principally of used machines upon which labor and materials had been expended to put the machines in salable condition. At year end after a careful inventory review by responsible officials, the reasonable market value of the used machinery was fixed. The inventories were written down to conform to this value. This included substantial sums for labor and materials expended during the current year in the reconditioning and alteration of the machines held in inventory. The Tax Court sustained these adjustments. The Court stated, "Petitioner's work in process consisted of labor and materials, expended in the reconditioning and alteration of machines held in inventory. Of necessity the value of these improvements was inextricably intertwined with the value of, and demand for, the basic machine * * *. When the market value of a machine in petitioner's inventory declined, it was but prudent accounting, commensurate with the lower of cost or market method of valuing inventory, to reduce the value of labor and materials invested in the renovation or alteration of that machine."

"When it became apparent that the going market value of a particular machine was less than [taxpayer's] cost basis, the inventory valuation was reduced to accord with market." Treating this as similar to worthless goods, the Court said, "This procedure properly resulted in the realization of a loss when it occurred—the year the machine became worthless, not necessarily the year the

this treatment was required to reflect fairly the financial condition of the company. He relied specifically on Bulletin 43 of the American Institute of Accountants, see note 12, supra, which was introduced in evidence without objection. "Statement 6: As used in the phrase *lower of cost or market*, the term *market* means current replacement cost (by purchase or by reproduction, as the case may be) except that: (1) Market should not exceed the net realizable value (i.e., estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal); and (2) Market should not be less than net realizable value reduced by an allowance for an approximately normal profit margin." The discussion goes on: "The term *market* is therefore to be interpreted as indicating utility on the inventory date * * *. * * * Replacement or reproduction prices would not be appropriate as a measure of utility when the estimated sales value, reduced by the costs of completion and disposal, is lower, in which case the realizable value so determined more appropriately measures utility. * * *."

machine was physically cast upon the scrap pile. C-O-Two Fire Equipment Co. v. Commissioner, 3 Cir., 1955, 219 F.2d 57." at p. 54.

Likewise, Ewing-Thomas Converting Co. v. McCaughn, 3 Cir., 1930, 43 F.2d 503, recognized that had the taxpayer there done what was done in our case—procure substantially all of the "inventory" out of which to fabricate the contracted materials—the inventory adjustment would have been allowed. With respect to deliveries made in 1920 against firm contracts with a sales price lower than cost, the Court had this to say. "The taxpayer could have taken such steps by the close of the year 1919 in the purchase and appropriation of sufficient yarn to complete the Meyers contracts, and it would have known exactly what the loss was. This would have been an identifiable event which would have fixed the loss so that it could be said without doubt to have been sustained in the year 1919 * * *." 43 F.2d 503, 504.

And even the much cited Court of Claims decision in Bedford Mills, Inc. v. United States, 1933, 2 F.Supp. 769, 77 Ct.Cl. 190 (prior opinion 1932, 59 F.2d 263, 75 Ct.Cl. 412) which as to finished goods adopted the "reproductive" rather than "replacement" test for the market value (see note 19, supra), recognized the applicability of the forerunner of what is now § 1.471–4(b).[21] Following its analysis of the structure of the Regulation and particularly subparagraph (a) (1) and (2), the Court did hold that after (1) determining cost, (2) market should then be ascertained "by applying * * * prices prevailing on the inventory date" for "what it would cost to purchase raw materials," labor, burden, etc. Upon this comparative determination of (1) and (2), the "lower of the two * * amounts should be used * * *." But

---

21. Most frequently cited is Elder Mfg. Co. v. United States, 1935, 10 F.Supp. 125, 129, 80 Ct.Cl. 666: "The term 'market' used in the statute and the regulations in the phrase 'cost or market, whichever is lower,' means the market price which [taxpayer] would have to pay for the merchandise * * * on the inventory date and not the price at which he sells such merchandise or offers it for sale." Like so many others, this case dealt with the post World War I market collapse in 1920. The taxpayer was a manufacturer and jobber of men's and boy's wear. On the critical date, April 30, 1920, the market was actually in excess of taxpayer's cost. Price reductions were not made until late 1920 or early 1921. The taxpayer attempted to get a lower market on the ground that the volume of his sales were less. The Court rejected the taxpayer's effort to bring itself under the first portion of present § 1.471–4(b) relating to stagnant nominal market (see note 18, supra). The problem there in no way resembles our case. See also Cleveland Automobile Co. v. United States, 6 Cir., 1934, 70 F.2d 365, effort to show automobiles unsalable because of poor engineering was rejected because taxpayer "had * * * no bona fide selling prices which after deduction of selling costs were less than the lower of cost or market"; it was a suppositious reconstructed lower sales price. Pierce-

Arrow Motor Car Co. v. United States, 1935, 11 F.Supp. 60, 63, 81 Ct.Cl. 563, rejected an effort to reduce inventory value of a discontinued model since taxpayer adhered for many months to previous standard sales price. The Court recognized, however, that " * * * inventory should be valued on the basis of the actual market value * * * if it should be shown that the real and actual market price thereof was less than cost." 11 F. Supp. at 64. See also D. Loveman & Son Export Corp., 1960, 34 T.C. 776, 795–796, in which the Court rejects as market value major mill quotations for steel unobtainable in fact due to war shortages; taxpayer's stock was purchased at higher cost from a small mill but resold at prices substantially higher than cost, the Court correctly observing "in short, we are concerned here with [taxpayers'] replacement market and not their resale market." 34 T.C. at 796. Ideal Reversible Hinge Co., 1927, 7 B.T. A. 1066, Commissioner allowed market as lower than cost, but Board rejected taxpayer's effort to reduce further to a "fair value"; Frederick A. Stearns, 1927, 8 B.T.A. 884, Board holds belated showing of lower market sales value not established; Ralph Ellstron, April 19, 1955, P-H Memo. T.C. 55091; Tax Court rejects effort to show lower sales price because averages and flat rates not reflecting market value were used.

that very sentence went on. Completing the sentence, the Court stated, "[t]he lower of the two foregoing amounts should be used except (3) in the case 'where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices, less proper allowance for selling expense.'" The Court described this as "the third comparative." True, it was not there used, but not because it was inapplicable. Rather, it was because the Court did not "understand that plaintiff contends for the use of the third comparative * * *" which was borne out by the fact that "(there is no evidence that [taxpayer] offered its finished goods at the prices contended for) * * *." 2 F.Supp. 769, 771.

In addition, we think § 1.471–4(a) (2) reflects further internal evidence of this reading of paragraph (b). The option to use cost or market, whichever is lower, extended by § 1.471–2(d) is withheld as to finished goods on hand or in process if manufactured for "delivery upon firm sales contracts * * * at fixed prices * * * under which the taxpayer is protected against actual loss * * *." (see note 18, supra) The significant thing is that the Regulation by means of this provision fixes the standard in terms of the *sale price*, and not, as is done in the opening part of paragraph (a), in terms of the bid price "* * * for the particular merchandise * * * usually *purchased* by the taxpayer * * *." In a sense this is actually a consistent application of the very same principle as prescribed in paragraph (b) that goods on hand (finished or in process) are worth what one can get for them. Under a firm contract protecting against loss the goods are worth what they cost and *no less* because the manufacturer will get at least that much.

■ To approach it as did the Tax Court, reality would be exchanged for fiction. As to raw materials on hand (see Item (a), note 4, supra), it reasoned, for example, that there was no evidence that the purchase price on the inventory date for each of the undescribed nuts, bolts, screws, rods, wheels, etc. was less than what had been paid, i. e., the cost. Consequently, it concluded, no comparative was established. But as an economic proposition, it is positively clear that to this Taxpayer such materials if then purchased would not have the value of their cost. Taxpayer's need was confined solely to this specific Government contract. It was obliged to fill that contract. It lacked the freedom which other "purchasers" of such items would have— namely, the right either to recall the items at a markup or use them in a profitable product. Legally bound as it was under its contract, Taxpayer was putting out a dollar to procure an item for which it would get, approximately, 70¢. With its stock on hand dedicated to a contract from which it could not legally escape, it would hardly be a true reflection of the financial condition of that concern were its inventory of dedicated goods valued at an amount which it could never get. Good accounting practice, good business judgment, and administration of taxes all coincide to demonstrate the wisdom and applicability of § 1.471–4(b).[22]

Moreover, this adds consistency in treatment as between the finished, delivered 96 trailers, on the one hand, and unfinished goods in process, on the other. The loss as to the 96 was allowed without dispute.[23] The Tax Court likewise allowed the loss as to the sixteen trailers on hand (see Item (b), note 2, supra). The result is that as to completed units, it is recognized that only 69.1066% of cost would be recovered. But in requiring cost without write-down to be used as to incompleted units in inventory, it as-

---

22. The very nature of goods in process and the unidentifiable elements of cost, labor, burden, etc. make it impossible to apply literally § 1.471–4(c). We have recognized that this must be given practical application. S. G. Sample Co. v.

Commissioner, 5 Cir., 1928, 23 F.2d 671, cited in 2 Mertens, Federal Income Taxation § 16.21, n. 67, p. 46 (1961).

23. Taxpayer's reply brief demonstrates this to be $34,578.48.

sumes for that tax year that 100% of cost will be recovered. This is not true now and it never was. It was not true during 1957, 1958, or since.

It is perfectly obvious that the expenditures which caused the inventory to have a cost greater than the contract sales price (as used under paragraph (b)) were made in the year ending February 1957. Those costs totaled $305,992.85 and included the amounts expended in inventory aggregating $194,209.49 (see note 4, supra). It was, therefore, in no sense an effort to obtain in that year a tax advantage for costs neither spent nor incurred until the following year. That loss was a present, existing, known and established one on February 28, 1957. Its existence and economic impact did not depend on subsequent events.[24] It was then known that there had already been spent more than could ever be received.

While we agree with Taxpayer that year ending inventories of $194,209.49 should be written down under § 1.471–4(b), we do not undertake to translate this into any dollar amount. The Taxpayer's brief used various methods based on percentage of costs incurred, percentage of costs recoverable (estimated and actual) and the like.[25] All of these tend to prove themselves out by a substantially identical result. The extent, if any, to which there should be an apportionment as between the two years, the basis upon which the proportion is to be determined, and the process of computation are matters for consideration and ascertainment by the Tax Court on remand. We likewise leave to that Court initially the procedural aspects relating to the nature of the rehearing, supplementing the present record, or related problems.

In reversing the Tax Court and remanding the case for further and not inconsistent proceedings, it likewise follows that we deny the Government's cross appeal or petition as to all or part of the 16 completed but undelivered trailers.

Affirmed on the cross appeal.

Reversed and remanded.

JONES, Circuit Judge (dissenting).

Under the guise of an inventory write-down, the taxpayer claims a deduction for an estimated loss on a contract of manufacture and sale prior to the realization of a loss. The Tax Court held it could not do so. The majority of this Court permits the deduction. I think the Tax Court was right. I dissent.

24. "While subsequent events are not determinative of a fact on a given date prior thereto, that which occurred * * * confirms what would have been a reasonable expectation at that time * * *." Lucker v. United States, Ct.Cl.1931, 53 F.2d 418, 424; Queen City Woodworks & Lumber Co. v. Crooks, S.D.Mo., 1934, 7 F.Supp. 684, 685; C-O-Two Fire Equipment Co. v. Commissioner, 3 Cir., 1955, 219 F.2d 57.

25. For example, one computation arrives at $62,080.73 as the proper write-down as of February 28, 1957, leaving $40,934.32 for loss to be taken in the succeeding year ending February 28, 1958.