ST. JAMES SUGAR COOPERATIVE, INC., Plaintiff-Appellee Cross Appellant,

v.

UNITED STATES of America, Defendant-Appellant Cross Appellee.

No. 79–2883.

United States Court of Appeals, Fifth Circuit.
Unit A

May 1, 1981.

**1220**

John P. Volz, U.S. Atty., New Orleans, La., Francis P. Dicello, M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, App. Sec., Gary P. Allen, William A. Whitledge, Attys., Tax Div., U.S. Dept. of Justice, Washington, D. C., for defendant-appellant cross appellee.

Baldwin & Haspel, Joel A. Mendler, Jerome J. Reso, Jr., New Orleans, La., for plaintiff-appellee cross appellant.

Before AINSWORTH and SAM D. JOHNSON, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

This is an appeal by the United States (Internal Revenue Service) from a judgment of the district court entered in favor of taxpayer, St. James Sugar Cooperative, Inc., for a refund of $1,818,612.55 in income taxes for St. James' fiscal year ending March 31, 1975. The court concluded that under the facts of this case and the provisions of 26 U.S.C. § 471, market not to exceed net realizable value is a permissible and accurate method of valuing ending inventory for an agricultural cooperative. Thus, the Government's conclusion to the contrary which formed the basis of the I.R.S. income tax deficiency herein was erroneous. Jurisdiction is based on 28 U.S.C. § 1291. We affirm.

## I. FACTS

St. James, a Louisiana corporation, is an agricultural cooperative owned by its 25-member sugar farmers. As a cooperative, St. James purchases sugar cane from its members and processes the cane into raw sugar for sale to sugar refineries and food processors. Sugar cane is delivered to St. James in late summer and early fall for the grinding season which occurs between October and December of each year. The sugar produced is a high-grade sugar used mainly for certain industrial production of foods and liquids containing sugar. Since this sugar is delivered through September of each year, there is usually a sizable inventory on hand at the end of St. James' fiscal year which runs from April 1 to March 31.

St. James is taxed as a corporation. However, since it is a nonexempt coopera-

---

* District Judge of the Western District of Louisiana, sitting by designation.

tive, St. James can deduct that portion of its income it returns to its members in the form of patronage dividends. Through the use of qualified patronage dividends, non-exempt cooperatives can avoid tax liability by passing their income onto their members.[1]

For the 1974–75 grinding season, just as it had in the previous four years, St. James entered into a contract with Colonial Sugars Company whereby it became obligated to sell and deliver to Colonial its entire 1974 production of raw sugar. A delivery schedule through September of 1975 was provided. However, the contract gave Colonial sole authority to accelerate or decelerate delivery for its own purposes. In addition, the contract provided a pricing formula based upon the average of each daily price quotation for sugar on the Louisiana Sugar Exchange for the calendar month in which actual shipments were made to Colonial.[2] Therefore, as a result of this contract, the entire ending inventory of processed sugar on March 31, 1975 was committed to Colonial at a price to be determined when Colonial requested delivery.

Prior to 1974, fluctuations in the bid price quotations of the Louisiana Sugar Exchange had been small. However, the market experienced dramatic changes during 1974 and 1975 due in part to tight supplies, intense speculation, and expiration of government price controls. Before this period of inflated activity in the market, the highest average monthly bid on the Louisiana Sugar Exchange was $11.04 per cwt in May 1963. In 1974, the price for raw sugar rose from a monthly average of $12.60 per cwt in January to its peak at $64.47 per cwt in November. The price dropped just as dramatically to an average of $28.50 per cwt in March 1975 and $15.93 per cwt by June 1975.[3]

On March 31, 1975, the bid price for raw sugar on the Louisiana Sugar Exchange was $27.47 per cwt. Approximately 70% of St. James' entire production for the 1974–75 grinding season was still on hand. However, in placing a value on this ending inventory, St. James did not use the March 31 market price of $27.47 per cwt. Instead, St. James valued its inventory at $17.07 per cwt based upon its estimate of the net realizable value the sugar would bring from Colonial in the declining market. The actual realizable value of the inventory was $17.88 per cwt based upon actual deliveries to Colonial between June 11, 1975 and September 18, 1975.

St. James arrived at the $17.07 value by use of "market not to exceed net realizable value" method of accounting. The Government contends that St. James impermissibly changed its accounting method for fiscal year 1975 so as to undervalue its inventory; therefore, St. James overvalued the cost of goods sold and correspondingly underestimated net income.[4] The Government as-

---

1. Taxation of nonexempt cooperatives is governed by subchapter T of the Internal Revenue Code, 26 U.S.C. §§ 1381–88. A farmer's cooperative may be able to reduce its tax liability to zero through the use of patronage dividends with proper tax planning. For a discussion of the general tax aspects of both exempt and nonexempt cooperatives, see *Farm Service Cooperative v. Commissioner of Internal Revenue*, 619 F.2d 718, 722–24 (8th Cir. 1980); Comment, *Federal Income Taxation of Farmers and Farmers' Cooperatives, 1913–1976*, 2 Del.J. Corp.L. 309 (1977); Commentary, *Federal Income Taxation: Agricultural Cooperative Associations and the Equal Treatment Requirement of Section 521*, 27 Ala.L.Rev. 611 (1975).

2. The price for which St. James sold its sugar was determined by a formula instead of the actual daily quotation for sugar because of the high grade sugar St. James produced. St. James' sugar possesses a high polarization of 99.6 degrees. The Louisiana Sugar Exchange price quotations are for the normal 96 degrees polarization. There are no daily quotations for the high polarization sugar. Therefore, St. James and Colonial agreed to a pricing formula based upon the quotations for sugar at the normal 96-degree polarization.

3. In 1975, the highest average bid quotation for any month was $40.12 per cwt in January and the low was $14.76 per cwt in December. The highest daily quotation for 1975 was $46.96 per cwt, while the low was $13.91 per cwt.

4. For an explanation of how inventory valuation affects income, see Note, *The Tax Parameters of Inventory Valuation*, 68 Ky.L.J. 344, 345 (1979–80).

serts that St. James' method of accounting improperly allows recognition of an unrealized, future loss. Accordingly, the Government used the March 31 bid price of $27.47 to value the inventory, thereby increasing the dollar value of the sugar on hand at March 31 by $3,282,090.71. The resulting tax deficiency plus interest was assessed in the amount of $1,818,612.35.

St. James asserts that it has consistently used the market not to exceed net realizable value method of accounting. According to St. James, it used the bid price on March 31 in previous years to value inventory only because price fluctuations were minimal and the bid price was itself a reasonably accurate approximation of the net realizable value of the sugar. Additionally, St. James contends its method clearly reflects income and is permissible when applied to the present facts under the appropriate Treasury Regulations.

The district court found that St. James was consistent in its use of the market not to exceed net realizable value and that it only became necessary to use the net realizable value in 1975 because the volatile market in 1974–75 was the first occasion in which the net realizable value was significantly lower than the current bid price. Therefore, the court held there was no violation of 26 U.S.C. § 446(e) for impermissibly changing accounting methods. The district court also held that St. James' inventory valuation clearly reflected income and did not violate the provisions of 26 U.S.C. § 471 governing use of inventories in determining income. Finally, the district court denied a request for attorneys' fees by St. James.

The district court's determination that St. James has consistently used the market not to exceed net realizable value method of accounting is a factual finding and has not been seriously challenged by the Government before this court. Since substantial evidence exists to support the court's conclusion, we find no error in this finding of fact. Therefore, we now consider the remaining two issues: 1) whether St. James' method of inventory valuation under the present facts is warranted by the Internal Revenue Code and applicable Treasury Regulations, and 2) whether St. James is entitled to an award for attorneys' fees.

## II. INVENTORY

### A. Requirements of the Internal Revenue Code

Any taxpayer involved in a business in which the production, purchase, or sale of merchandise is an income-producing factor must value its inventories in order to correctly determine income for tax purposes. Treas.Reg. § 1.471–1. Since inventory valuation is a method of accounting,[5] any method by which a taxpayer values inventory must conform to the rules for accounting methods under 26 U.S.C. § 446, as well as 26 U.S.C. § 471 which establishes the rules of inventories. According to the Government, the method used by St. James does not fit within these rules.

Under the general requirements of section 446, taxable income is to be computed by the method which taxpayer regularly uses to compute accounting income. However, no method of accounting may be used that in the opinion of the Commissioner of Internal Revenue does not clearly reflect income.[6] The Commissioner has been given

---

5. See Graichen, *Undervaluation of Inventories—Tax and Accounting Problems: Implications of Sections 481 and 1311–15*, 20 N.Y.U. Inst.Fed.Tax 423, 430 (1962).

6. Treas.Reg. § 1.446–1(a)(2) provides as follows:

> (2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

broad discretion in determining what methods satisfy this standard. *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 532, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979); *Commissioner of Internal Revenue v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1282, 3 L.Ed.2d 1360 (1959); *Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930).

■ Additionally, section 471 specifically establishes two distinct tests for inventory valuation.[7] First, a taxpayer may only use a method for valuing inventory that conforms as close as possible to the best accounting practice in the trade or business. Secondly, the method must be one that clearly reflects income. *See Thor Power Tool Co., supra*, 439 U.S. at 532, 99 S.Ct. at 781.

It is clear that St. James has complied with the initial requirements of both sections 446 and 471. As for section 446, the Government does not dispute that St. James used the same method to determine taxable income as it regularly did to determine accounting income.[8] Likewise, the Government does not contest that the mar-

ket not to exceed net realizable value method of inventory valuation meets the standard of best accounting practice in the trade or practice as required in the first test of section 471.[9] Therefore, the sole issue left for our determination is the test common to both sections 446 and 471—whether St. James' use of net realizable value for pricing its ending inventory clearly reflects income.

■ Whether an accounting method will clearly reflect income depends on the facts and circumstances peculiar to each case. *Lincoln Electric Co. v. Commissioner of Internal Revenue*, 54 T.C. 926, 933 (1970), aff'd 444 F.2d 491 (6th Cir. 1971). However, two methods of inventory valuation, the cost and lower of cost or market methods, are specifically approved of by Treasury Regulations. Treas.Reg. § 1.471–2(c). It is under this second method, lower of cost or market, that St. James contends lies an exception allowing its use of net realizable value.

The rules governing the use of the lower of cost or market method are found in Treas.Reg. § 1.471–4.[10] In this Regulation,

---

7. Treas.Reg. § 1.471–2(a). 26 U.S.C. § 471 provides as follows:

   **§ 471. General rule for inventories**
   Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

8. As we stated earlier, there is substantial evidence to support the district court's finding that St. James consistently used the same method of inventory valuation and that the method it used was market not to exceed net realizable value.

9. Treasury Regulations state that "inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business." Treas.Reg. § 1.471–2(b). This standard of "best accounting practice" has been construed to be synonymous with those methods of inventory valuation which are in accord with generally accepted accounting principles. *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 532,

99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979); *E. W. Bliss v. United States*, 224 F.Supp. 374, 382 (N.D.Ohio 1963), aff'd 351 F.2d 449 (6th Cir. 1965). The Government does not dispute that St. James' method of valuation was in accord with generally accepted accounting principles.

10. Treas.Reg. § 1.471–4 provides as follows:
   **§ 1.471–4 Inventories at cost or market, whichever is lower**
   (a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases—
   (1) Of goods purchased and on hand, and
   (2) Of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost.

"market" is defined for ordinary circumstances as the current bid price prevailing at the date of inventory. In this case, that would be $27.47 per cwt as of March 31, 1975. However, the Regulations offer two exceptions in which a taxpayer may value inventory below market.[11] The exception claimed by St. James is found in section 1.471–4(b) and provides that when merchandise has been offered for sale in the regular course of business at prices less than the current bid price, the inventory may be valued at the lower price less direct cost of disposition. The method of valuation in this exception forms the basis of the net realizable value approach, since it allows a taxpayer to value inventory at the price items are expected to realize rather than the price at which it would immediately cost to replace them.[12]

We recognized the net realizable value approach in *Space Controls v. Commissioner of Internal Revenue*, 322 F.2d 144 (5th Cir. 1963). In *Space Controls*, the taxpayer was obligated under a fixed price contract with the Government to manufacture trailers which were unsuitable for use by anyone other than the Government. Although the bid price was available, we upheld the writedown of inventory to net realizable value based upon section 1.471–4(b). We found that since the contract constituted a

sale in the regular course of business and the price fixed by the contract was less than the current bid price, the regulatory language controlled, thus allowing a reduction in value based upon the fixed selling price and estimated cost of completion.

Recently, in *Thor Power Tool Co. v. Commissioner of Internal Revenue, supra,* the Supreme Court considered the same regulatory scheme. In *Thor*, the taxpayer wrote down its "excess" inventory to what it estimated to be its net realizable value. Since it was agreed that the taxpayer's actions were in accord with generally accepted accounting principles and therefore in compliance with the best accounting practice in the business, the remaining issue left for Supreme Court determination was the same issue in sections 446 and 471 we consider in the present case—whether the taxpayer's inventory value clearly reflected income. In making its decision, the Supreme Court recognized, as we have, that inventory is normally to be valued at the current bid price and that any valuation below that price must comply with either of the two exceptions in Treas.Regs. §§ 1.471–4(b) and 1.471–2(c) allowing writedowns. Summarizing these exceptions, the Court determined that any departure to a lower inventory valuation must be substantiated by objective evidence of "actual offerings, ac-

(b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market.

(c) Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at

the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article.

11. In *Thor Power Co. v. Commissioner of Internal Revenue,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court stated the first exception was found in Treas.Reg. § 1.471–4(b) and the second was in section 1.471–2(c). Since we find that St. James satisfied the requirements of the first exception, it is unnecessary to discuss the second exception.

12. The net realizable value method of inventory valuation places a value on inventory based upon the estimated selling price less reasonably predictable costs of disposition. For a discussion on the use of the method, *see* American Institute of Certified Public Accountants, Inc., Financial Accounting Standards, Ch. 4, Stmt. 6 (Accounting Research Bulletin, 1976); *Tax Parameters, supra,* note 4 at 359.

tual sales, or actual contract cancellations." 439 U.S. at 535, 99 S.Ct. at 782.

In *Thor*, the taxpayer offered no objective evidence to verify its estimate of reduced market value. Indeed, despite the lower inventory value, the taxpayer continued to hold the goods for sale at original prices. Therefore, the Court held that since there was no objective evidence of the reduced value of the excess inventory, the taxpayer did not comply with the Regulations.[13]

That is not the case here. St. James produced sufficient objective evidence of reduced market value from the bid price at the inventory date on March 31 to comply with section 1.471–4(b). At the time of its inventory valuation, St. James was involved in a sugar market that had never before experienced such extreme deviations in the market. Sugar prices normally fluctuated by less than $1 per cwt between the high and low each year before decontrol. The March 31 bid price had more than tripled from normal levels in the years prior to 1974 and the market had been constantly declining from its high in November 1974 at an average of 10–20% per month through March 1975. Like the taxpayer in *Space Controls*, St. James had dedicated its inventory to a contract to which it was bound. St. James was therefore obligated to sell its complete inventory of specialized sugar, unavailable to purchase on the open market, at prices to be determined after March 31 on a steadily declining market.

In addition, the value St. James placed upon its inventory was reasonably and independently made. Unlike the taxpayer in *Thor*, St. James produced expert witnesses in tax accounting for cooperatives who testified that the $27.47 per cwt value would distort St. James' income and that the $17.07 per cwt value was a more accurate

description on March 31 of the inventory's worth in view of the evidence available concerning the declining market and the applicable contract. Furthermore, while the taxpayer in *Thor* continued to offer its excess inventory at the original sales price, the evidence shows that St. James actually offered to have Colonial firm price four barges of sugar at the $17.07 per cwt price. However, Colonial declined the offer, deciding instead to rest its fortunes on the declining market. Finally, the actual sales of the inventory to Colonial at an average price of $17.88 per cwt shows the reasonableness of the calculations. We note that "[w]hile subsequent events are not determinative of a fact on a given date prior thereto, that which occurred . . . confirms what would have been a reasonable expectation at that time." *Space Controls, supra,* 322 F.2d at 155.

Clearly, the valuation St. James ascribed to its inventory reflected the taxable income for the fiscal year ending March 31, 1975. Were we to accept the Government's valuation, "reality would be exchanged for fiction." *Space Controls, supra,* 322 F.2d at 154. The bid price on March 31 was not only unrealistic as a value for St. James' sugar inventory; it also proved to be unobtainable. In *Space Controls*, we phrased it this way: "With [taxpayer's] stock on hand dedicated to a contract from which it could not legally escape, it would hardly be a true reflection of the financial condition of that concern were its inventory of dedicated goods valued at an amount which it could never get. Good accounting practice, good business judgment, and administration of taxes all coincide to demonstrate the wisdom and applicability of § 1.471–4(b)." *Id.*

### B. *Thor* and Net Realizable Value

The Government also contends that St. James is precluded from ever using the

---

13. For a discussion of *Thor* and the results of its holding, *see* Sutherland, *Tax Treatment of Inventory Write-Downs After Thor Power Tool,* 29 Tul.Tax Inst. (1980); Bush, Flannery and Dasburg, *IRS' Tough New Rules Under Thor Power: How They Work; What They Mean; How to Cope,* 52 Journal of Taxation 194 (April 1980); Dasburg, Porche and Flannery, *Inventory Valuation After Thor Power Tool: Analyzing the S. Ct. Decision and Its Impact,* 50 Journal of Taxation 200 (April 1979); Mihalov, *Inventory Write-Downs and Thor Power Tool,* 57 Taxes 384 (June 1979); Dasburg and Morehead, *Can GAAP Still Support Inventory Valuation After Thor?,* 148 Journal of Accountancy 68 (Oct. 1979).

net realizable value method by the Supreme Court decision in *Thor.* According to the Government, *Thor* specifically rejected the net realizable value method for valuing inventories.

We find no such rejection in *Thor.* Indeed, both *Thor* and the Regulations it relies upon sanction the use of the net realizable value method within the guidelines of sections 1.471–4(b) and 1.471–2(c). Both of these Regulations allow inventories to be reduced under limited circumstances to an objective estimate of the net realizable value. *Thor* did not eliminate this method of valuation. Rather, the Supreme Court's reading of the Regulations confirms that taxpayers can rely on sections 1.471–4(b) and 1.471–2(c) to support a net realizable valuation. *Thor* only established the parameters of objectivity, outside of which the net realizable value method cannot be used for tax purposes.[14]

### C. Annual Accounting Concept

■ Finally, the Government maintains that St. James' valuation of inventory violates the principles of annual accounting for tax purposes,[15] allowing St. James to recognize a loss in one taxable year that will not be realized until the following year. The Government argues that the tax return should only reflect "identifiable items" or "closed transactions" which occur during the taxable year.

These doctrines have been held to be inapplicable to inventories. We specifically

rejected this argument in *Space Controls,* noting that inventory valuation rules were a well-recognized exception to the principles of annual accounting and reflecting only closed transactions in tax returns.[16] Additionally, the Supreme Court considered these principles in *Thor.* The Tax Court and Seventh Circuit had constructed the Regulations to require "closed transactions" or "identifiable events" as a basis for valuation.[17] However, the Supreme Court redrafted this criteria as the "objective evidence" test.

### III. ATTORNEYS' FEES

■ In a cross-appeal, St. James requests an award of attorneys' fees as a prevailing party under 42 U.S.C. § 1988. However, we have consistently held that section 1988 permits an attorney's fee award to a taxpayer only when the Government is the moving party. *Kipperman v. Commissioner of Internal Revenue,* 622 F.2d 431 (9th Cir. 1980); *Jones v. United States,* 613 F.2d 1311 (5th Cir. 1980); *Key Buick Co. v. Commissioner of Internal Revenue,* 613 F.2d 1306 (5th Cir. 1980); *Prince v. United States,* 610 F.2d 350 (5th Cir. 1980). Since St. James was the plaintiff in this action, the request for attorneys' fees is denied.

### IV. CONCLUSION

To summarize, we find that St. James complied with the applicable sections of the Internal Revenue Code and Treasury Regulations as construed by the Supreme Court in *Thor.* Additionally, the district court

14. As noted earlier, we recognized the legitimacy of using the net realizable method under Treas.Reg. § 1.471–4(b) in *Space Controls.* However, the Supreme Court distinguished *Space Controls* from the facts in *Thor* because of the objective evidence of reduced market value found in *Space Controls.* "In *Space Controls,* the fixed-price contract offered objective evidence of reduced inventory value; the taxpayer in the present case provided no objective evidence of reduced inventory value at all." 439 U.S. at 536 n. 13, 99 S.Ct. at 783 n. 13.

15. For a discussion of the annual accounting concept, *see generally* Comment, *Contested Tax Liabilities and the Annual Accounting Concept—The Japanese Trading Co. Application,* 115 U.Pa.L.Rev. 961 (1967).

16. In *Space Controls,* we gave two reasons why the annual accounting principle was inapplicable. First, we noted that applying the principle to inventories would require as its basis the unfounded assumption that no loss is incurred until the entire inventory is delivered and paid for. Secondly, we observed that the lower of cost or market method, expressly approved by the Regulations, was itself an exception to the principles of annual accounting and reflecting in income tax returns only closed transactions. 322 F.2d at 148.

17. *Thor Power Tool Co. v. Commissioner of Internal Revenue,* 64 T.C. 154 (1974), aff'd 563 F.2d 861 (7th Cir. 1977).

correctly dismissed St. James' request for attorneys' fees.  Therefore, we affirm.

AFFIRMED.