APPLIED COMMUNICATIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Applied Communications, Inc. v. Commissioner
Docket No. 5449-87
United States Tax Court
T.C. Memo 1989-469; 1989 Tax Ct. Memo LEXIS 469; 57 T.C.M. (CCH) 1473; T.C.M. (RIA) 89469; August 30, 1989
*469 P began as a custom computer software business and, based upon its accountant's recommendation, reported its income (derived mainly from services) on the cash method of accounting for financial and tax purposes. Two years later when P began selling hardware, it reported hardware income on the accrual method of accounting for financial and tax purposes, without changing from the cash method for its software generated revenue. Several years later P, for financial purposes, changed to the accrual method for reporting its software generated income. At about the same time P's business was re-oriented toward the development and sale of packaged, as opposed to customized, software. P's creditors and regulatory authorities required P to report revenue for financial reporting purposes on the accrual method. The cash method, although consistently used by P, was only being used to report revenue from software for tax purposes. Use of the cash method caused the deferral of relatively substantial amounts of income. R determined under sec. 446, I.R.C. 1954, that P's use of the cash method did not clearly reflect income. P contends that R abused his discretion and that the cash method does *470 clearly reflect income. Held, P did not show that R abused his discretion in determining that the cash method did not clearly reflect income. Held further, P's business changed from a service-oriented to a product-oriented business and P's consistent use of the cash method did not, per se, cause the clear reflection of income. Paul J. Gardner and James D. Sherrets, for the petitioners. Albert B. Kerkhove, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioner's taxable years ending September 30, 1979, 1980, 1981, 1982, and 1983, in the amounts of $ 5,478, $ 137,356, $ 127,791, $ 546,314, and $ 344,376, respectively. The sole issue for our consideration is whether petitioner has established that respondent abused his discretion by determining that petitioner's method of accounting does not clearly reflect taxable income for the taxable years ended September 30, 1982 and 1983. FINDINGS OF FACT General Background
The parties entered into a stipulation of facts, along with attached exhibits, which are incorporated by this reference. Petitioner, Applied Communications, Inc. (ACI), a Nebraska corporation, had *471 its principal place of business in Omaha, Nebraska, at the time its petition was filed. ACI's U.S. Corporation Income Tax Returns (Forms 1120), for the taxable years ended September 30, 1979 through September 30, 1983, were filed with the Internal Revenue Service at the Ogden Service Center. ACI was closely held until July 1983, when it made its initial public offer of shares in accord with state and Federal security provisions. From its inception in 1975, the majority of ACI's revenues were generated from fees for the design, development, and maintenance of electronic funds transfer systems (EFT). [1] During its taxable year ended September 30, 1977, ACI began a separate business activity selling computer hardware, in addition to its software business. ACI developed customized software systems, including one of the first statewide bank transaction interchanges, automatic teller machine (ATM) networks, and two of the first nationwide EFT switches named "CIRRUS" and "EXCHANGE." Software Revenue Source in Controversy
Prior to 1982, ACI principally developed customized software applications. *472 Its experience with EFT systems led to the introduction, during September 1982, of so-called EFT "packaged software" products named "BASE 24." During this period revenues expanded precipitously. BASE 24 operated on Tandem NonStop II computer equipment. BASE 24 is a family of integrated software products designed to provide reliable 24-hour service for on-line processing for EFT systems. On-line or instantaneous EFT processing facilitates financial transactions electronically initiated by retail bank customers. EFT technology may be employed in a variety of electronic devices, including ATMs. BASE 24 employs a modular software architecture which permits additional modular applications to be integrated as the customer's requirements change. EFT reduces paper flow, improves record keeping, lowers transaction costs, accelerates payment, reduces credit exposure, and may increase a financial institution's ability to expand its market by providing customer convenience and product services. By 1983, businesses were experimenting and utilizing EFT networks in grocery stores, retail department chain stores, convenience stores, gas stations, and homes. As of mid-July 1983, ACI had delivered *473 custom systems to 27 customers, 12 of which were among the 100 largest banks in the United States. At that time Base 24 consisted of 21 different product modules which were separately licensed to customers. The price range of integrated or networked product module packages was from $ 180,000 to $ 587,000. BASE 24 became the center or focus of ACI's marketing strategy of providing a complex system of services to customers in a simple, comprehensive manner. Even though BASE 24 is packaged software, it requires some customized software to adapt it to a particular customer's needs. By July 1983, ACI was focused upon packaged software but continued to contract with customized software customers if the customer's needs were compatible with or would permit expansion of ACI's packaged software products. Customized software was developed and sold through professional service contracts. The client paid a fee based upon a scaled or fixed charge per "manweek" of professional services. Profitability to ACI was, to some extent, dependent upon ACI's ability to accurately estimate the number of manweeks necessary to complete the contract. ACI generally retained ownership of custom software (programs) *474 and granted custom software clients a perpetual nonexclusive license. On occasion ACI granted an ownership interest and/or a right to sublicense to a custom software customer. Packaged software (BASE 24) was licensed under nonexclusive perpetual license agreements. The client received the right to use one copy of the software on designated equipment for a onetime fixed fee. Additional copies of the software were available for an additional fee. Payment for a software license was made 50 percent upon the signing of the contract and 50 percent upon installation of the product. ACI provided maintenance under software contracts on a 1-year minimum term basis, with a 90-day cancellation clause. Annual maintenance fees were typically 12 percent (subject to annual increases) of the license fee, payable in monthly installments. The first 90 days of maintenance was provided without additional charge as part of the license fee. ACI provided up to "30 person days" of instruction and additional instruction could be purchased on a per "student day" basis. Purchase of additional modular BASE 24 software entitled the purchaser to additional "free" instruction. Technical support was also *475 available on an hourly fee basis, plus reimbursement for travel expenses. Until February 1, 1983, ACI operated under an agreement with a computer equipment manufacturer which provided for purchase discounts to ACI on hardware sold in connection with ACI software. After February 1, 1983, ACI operated under an agreement which provided that ACI would receive a software house commission based on the selling price of hardware for any customer installation in which ACI's software was instrumental in inducing the customer to purchase the equipment. Accounting Methods Used By Petitioner
ACI, since its inception in 1975, has consistently used the cash method of accounting to report taxable income from its software sales. Jerry Sestak, a certified public accountant (CPA), set up and worked on ACI's books. CPA established a simple bookkeeping system utilizing the cash method of accounting because ACI was a service-type organization providing consulting and custom software development. CPA thought of ACI as similar to service-type businesses, such as attorneys, accountants, or engineers. Additionally, as a "start up type company," CPA expected ACI would have huge fluctuations in cash flow. *476 The cash method of accounting was utilized for both financial and tax reporting purposes. Beginning in 1977, ACI became involved in hardware sales and has consistently used the accrual method of accounting to report income from its hardware sales for tax and financial purposes. At the time it started employing the accrual method for hardware sales, ACI did not request the permission of the Commissioner of Internal Revenue to change its accounting method from cash to a combined or hybrid method. Beginning in 1981, ACI reflected its software revenues on the accrual method for book purposes and cash method for tax reporting purposes. This change placed the hardware and software accounting practices on the same method for book purposes and on different methods for tax reporting purposes, thereby resulting in a hybrid tax reporting method and a uniform financial reporting method. ACI, during the years in issue, used these two different methods or a hybrid method to report income for tax purposes. For financial reporting purposes and for reporting to the Securities and Exchange Commission (SEC), ACI utilized the accrual method of accounting for both its software and hardware sales. *477 ACI used the accrual method for nontax reporting of software sales in order to comply with conditions and covenants of loan agreements with financial institutions, to comply with SEC and state security provisions, and to satisfy other financial and business purposes, including ACI's intent to "go public." The conversion from accrual to cash method accounting for software income was accomplished at year's end by means of adjusting journal entries only for tax purposes. ACI's specific policy concerning the reporting of sales or revenues for income tax purposes was as follows: (1) Professional fees, composed mainly of time and material charges pursuant to service contracts, were recognized as costs were incurred. The amount recognized was computed by including estimated earned fees in the proportion that costs, to date, bore to total estimated costs to be incurred for the entire contract. Losses on professional service contracts were not estimated, but claimed only when known. (2) License fees from software products were recognized in two stages. At the time of the contract execution, the lesser of 50 percent of the contract price or the amount actually paid upon execution was recognized. *478 The balance was recognized within 60 days of product acceptance by the customer or when the customer was billed. (3) Pre-February 1983 hardware sales were included, net of cost, in license fees as outlined in (2) above. (4) Equipment commissions received in association with software sales were recognized when the title to the equipment passed to the customer. (5) Software maintenance fees were recognized ratably over the terms of the contract during the time services were being provided. Effect of Different Accounting Methods
ACI, for the taxable years ended September 30, 1982, and September 30, 1983, reported revenue from the following sources: Source of Income
9/30/82 9/30/83 Professional fees and services
$ 4,851,938
$  4,985,272
Software license fees
2,066,344
8,721,054
Net equipment sales
1,208,827
484,659
Software maintenance fees
224,297
408,265
Totals
$ 8,351,406
$ 14,599,250
The conversion of ACI's software revenue from the accrual to cash basis for tax reporting purposes resulted in deferred revenue balances for tax purposes of $ 1,505,201 and $ 4,008,933 for the 1982 and 1983 taxable years, respectively. Accordingly, the increase in the balance for the 1983 taxable year was $ 2,503,732. *479 Respondent determined that these differences should be included in petitioner's taxable income to clearly reflect income. ACI's annual reports for its 1982 and 1983 fiscal years reflected net income, before provision for tax, of $ 1,131,100 and $ 2,078,310, respectively. On its Federal income tax returns for the 1982 and 1983 taxable years, petitioner reported taxable income of $ 172,867 and a loss of $ 530,538, respectively. Expert Opinions
Petitioner offered two expert witnesses on the question of whether income was clearly reflected on petitioner's tax returns. Gregory J. Duman (Duman) had a few years of experience as an accountant and certified public accountant and then served as ACI's manager of administration during the years in issue and subsequently as ACI's comptroller. In Duman's opinion the cash method more clearly reflected "taxable income" from software sales than the accrual method. Duman's report and testimony lacked specificity and supporting theory and was composed of broad generalities. Duman's opinion provides no assistance in our consideration of whether petitioner's method of income clearly reflected income. Petitioner's second expert, Thomas J. Purcell III *480 (Purcell), had an accounting and legal academic background and had served as a consultant with an accounting practice for a few years. Since 1979, Purcell has been a full-time faculty member at Creighton University. Purcell opined that ACI's use of the cash method to report software revenue for tax purposes "reflected its taxable income with as much accuracy as standard methods of accounting practice [would] permit." In support of his conclusion Purcell provided the following reasons: (1) ACI is a service business; (2) the cash method of accounting is not prohibited by statute or regulation and has been accepted by respondent in service businesses; (3) no significant mismatching of income and expenses occurred which "constitutes an abusive manipulation of taxable income" (noting that in the use of the cash method there is no attempt to match income and expenses); and (4) there was no income distortion by use of the cash method of accounting. Purcell also opined that "the [cash] method of accounting used by ACI to prepare and file its income tax returns more clearly reflects taxable income than does the accrual method of accounting used by ACI for financial purposes." In support of *481 this conclusion Purcell provided the following reasons: (1) The methods used by ACI conform "to principles of tax accounting which are used to clearly reflect income;" (2) ACI's financial reporting method was "an aggressive posture * * * and, if used for preparation and filing of tax returns, would distort taxable income;" and (3) there is no need to conform income reporting objectives for financial and tax purposes. Respondent offered experts on the question of whether petitioner's use of the cash method to report income for tax purposes clearly reflected income. Stephen A. Schreiner (Schreiner), a certified public accountant with 15 years of experience as an internal revenue agent for respondent, opined that petitioner should have used the accrual method rather than the cash method to clearly reflect income for tax reporting purposes. In support of his conclusion, Schreiner provided the following reasons: (1) The issue in this case involved the "pervasive or fundamental principle of accounting * * * [t]hat revenue for a period is generally determined independently by applying the realization or sales basis principle;" and (2) "the accrual method of reporting revenue is generally *482 held [in accord with generally accepted accounting principles (GAAP)] to be the proper method" which ACI should have utilized. Respondent's second expert, Charles H. Smith (Smith), has been a certified public accountant since 1972 and a professor and director and department chair at the University of Illinois and Pennsylvania State University, respectively, since 1976. Smith opined that to clearly reflect income, petitioner's income or performance "should have been measured on the basis of GAAP (centered on the accrual method)" rather than by the cash method of accounting. In support of his conclusion Smith set forth the following reasons or conclusions: (1) "Income as a concept is intended to measure the performance of a business enterprise;" (2) the best measure of business performance is the accrual method (which is central to GAAP); (3) the accrual method utilizes the economic substance of transactions, including the need to match costs against revenues and to record receivables and payables; (4) under the GAAP accrual approach, income is recognized "if material uncertainties do not exist;" (5) ACI's annual reports for the years in issue indicate that ACI's management embraced *483 GAAP "for measuring income;" and (6) "the circumstances surrounding ACI's transactions [software] were such as to suggest no need for delay in recognition of material amounts of revenues until receipt of cash." OPINION Section 446(a)[2] provides the general rule that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Under section 446(b) "if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Section 446(c) permits a taxpayer, subject to section 446(a) and (b) to use the cash method, [3] accrual method, other statutorily permitted methods or any combination permitted in the regulations. Here, respondent has not questioned whether petitioner's book and tax return reporting methods were in conformity or whether petitioner would otherwise be permitted to mix the cash and accrual methods and use a hybrid method. Nor has respondent questioned whether petitioner consistently utilized the cash method for reporting software revenue. The sole question raised by respondent's *484 determination is whether petitioner has established that respondent abused his discretion in determining that the cash method does not clearly reflect and that the accrual method does clearly reflect petitioner's software income. Section 446 vests respondent with broad discretion in determining whether a particular method of accounting clearly reflects income, and a heavy burden is imposed upon the taxpayer to overcome respondent's determination. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); United States v. Catto, 384 U.S. 102, 114 (1966); Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930); Molsen v. Commissioner, 85 T.C. 485, 498 (1985). Although respondent has broad discretion, *485 he cannot require a taxpayer to change from an accounting method which clearly reflects income. Molsen v. Commissioner, supra at 498; St. James Sugar Cooperative, Inc. v. United States, 643 F.2d 1219 (5th Cir. 1981); Bay State Gas Co. v. Commissioner, 75 T.C. 410, 417 (1980), affd. 689 F.2d 1 (1st Cir. 1982); Auburn Packing Co. v. Commissioner, 60 T.C. 794, 798-800 (1973); Garth v. Commissioner, 56 T.C. 610, 618 (1971). "Proof that the method is in accordance with generally accepted accounting principles does not * * * prove that the method clearly reflects income under the income tax law." Thor Power Tool Co. v. Commissioner, 64 T.C. 154, 166 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979). "In the final analysis, whether petitioner's method clearly reflects income is primarily a question of fact." Madison Gas & Electric Co. v. Commissioner, 72 T.C. 521, 555 (1979), affd. 633 F.2d 512 (7th Cir. 1980). Our role, however, is not to weigh and determine the relative merits of systems of accounting, United States v. Catto, supra at 114, nor to determine in our own judgment whether petitioner's method clearly reflected income, but to determine whether there is *486 an adequate basis in law for respondent's determination that petitioner's method did not clearly reflect income. RCA Corp. v. United States, 664 F.2d 881, 886 (2d Cir. 1981), cert. denied 457 U.S. 1133 (1982). Petitioner argues that its method of accounting clearly reflects income because: (1) Its income has been reported fairly and honestly, Osterloh v. Lucas, 37 F.2d 277 (9th Cir. 1930); Bonaire Development Co. v. Commissioner, 679 F.2d 159 (9th Cir. 1982); (2) its method of accounting computes income with "as much accuracy as standard methods of accounting practice permit," Caldwell v. Commissioner, 202 F.2d 112, 115 (2d Cir. 1953), affg. and modifying on an unrelated matter a Memorandum Opinion of this Court; Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 356 (1st Cir. 1970), affg. a Memorandum Opinion of this Court; (3) it has consistently applied the cash method for software revenues, sec. 1.446-1(a)(2), Income Tax Regs.; Photo-Sonics, Inc. v. Commissioner, 42 T.C. 926 (1964), affd. 357 F.2d 656 (9th Cir. 1966); City Investing Co. v. Commissioner, T.C. Memo. 1987-36, 52 T.C.M. 1422, 1427, 56 P-H Memo T.C. par. 87,036; (4) its use of the cash method is in accord with accepted *487 industry practice, sec. 1.446-1(a)(2), Income Tax Regs.; and (5) use of the accrual method of accounting as required by the SEC or as in accord with GAAP is "strong, but not binding, evidence that the [accrual] method 'clearly reflects income,'" Commissioner v. Idaho Power Co., 418 U.S. 1, 15 (1974); Schlude v. Commissioner, 372 U.S. 128 (1963); American Automobile Assn. v. United States, 367 U.S. 687 (1961). Respondent, citing essentially the same cases and regulatory sections, argues that he has not abused his discretion because: (1) Generally accepted accounting principles and regulatory requirements support his determination; (2) his determination was necessary to "reach a substantial identity of results;" (3) "[his] determination was consistent with ACI's business practice," namely, the use of the accrual method for all business purposes; and (4) his determination is supported by expert testimony. We find that petitioner has not shown that respondent abused his discretion in determining that petitioner's use of the accrual method does not clearly reflect income. Petitioner's initial (1975) and exclusive business activity was providing professional services designing, installing, *488 and maintaining custom software for clients. On advice of its accountant, petitioner employed the cash method of accounting for keeping its books and reporting its income to the Federal Government. After a few years, petitioner began selling hardware in conjunction with software sales. The accrual method was used to report income from hardware sales for both book and income tax purposes. Beginning in 1981, petitioner maintained its financial books for both software and hardware on the accrual basis, but continued, for tax purposes, to report software revenues on the cash method and hardware revenues on the accrual method. Uniform use of the accrual method for financial purposes was required under loan contracts with creditors and SEC requirements. The accrual method was also in accord with GAAP. Petitioner had been a specialist in the development of software concerning EFT and beginning in the early 1980's developed BASE 24, a related and integrated series of modular EFT software applications. After focusing upon the marketing of BASE 24 as packaged software, petitioner generally only accepted custom software jobs which added to or were compatible with BASE 24. Petitioner, by *489 concentrating on the sale of BASE 24, reduced the amount of custom software work it performed, although customizing was necessary to conform BASE 24 to a particular client's business. This change in focus to packaged software, which was priced on the basis of the BASE 24 modules contracted for by the customer, changed petitioner's business emphasis from services to product sales, with service as an adjunct to the product. Although obviously not a decisive factor, we see this change from services to a product-oriented operation as one of the factors favoring respondent's determination that the cash method did not clearly reflect petitioner's software income. Moreover, petitioner had voluntarily adopted the accrual method (for both financial and tax purposes) for reporting its income derived from hardware sales. Petitioner has not exhibited any business purpose or other rationale for maintaining its software sales on the cash basis for income tax purposes only. Although it could be argued that the cash method produces a reduced or deferred tax burden for petitioner and that may be a valid business purpose, that is not the focus of our inquiry and does not show that respondent abused *490 his discretion. Other factors convince us, as a matter of law, that respondent did not abuse his discretion. The accrual method of accounting would be appropriate for reporting petitioner's income under generally accepted accounting principles (GAAP). Petitioner does not deny that GAAP would call for the use of the accrual method. Petitioner, however, argues that the acceptance of the accrual method and/or GAAP standards in other cases was for the purposes of "clearly reflecting income." Here, petitioner generally contends that the cash method clearly reflects income because it operates a service business. As indicated above, petitioner was not as service oriented during the years in issue as it was when the business began in 1975. More specifically, the use of the cash method of accounting is not appropriate for petitioner because it generates substantial amounts of receivables or deferrals of revenue as evidenced by the difference between its software income for tax and financial purposes. American Fletcher Corp. v. United States, 832 F.2d 436, 439 (7th Cir. 1987); see also Finney & Miller, Principles of Accounting-Intermediate 12 (7th ed. 1974): The differences are significant *491 and generally on the increase during the years in issue. The so-called "deferrals" or differences between the cash and accrual methods were $ 1,505,201 and $ 2,503,732 for the 1982 and 1983 taxable years, respectively. ACI utilized the accrual method of accounting for nontax reporting of software sales in order to comply with regulatory requirements of the SEC. The regulatory agencies' compulsory accounting practices are relevant, and we accord them some probative significance in the overall evaluation of whether respondent abused his discretion. Also see Commissioner v. Idaho Power Co., 418 U.S. at 15, which holds that "where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency and that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences." (Fn. ref. omitted.) [4] Additionally, petitioner's creditors have, by contractual agreement, committed petitioner to report its financial results to them under the accrual method.
Petitioner *492 uses the accrual method of accounting to report its financial results to shareholder-owners. Petitioner's annual reports, which are provided to shareholders and become available to the general public as an indication of petitioner's financial results, are based upon the exclusive use of the accrual method. It should be noted that petitioner began reporting its financial results under the accrual method of accounting prior to going public and/or the SEC regulatory requirement to do so. It seems incongruous for petitioner to contend that the cash method of accounting more clearly reflects income (for tax purposes) and then represent its earnings under the accrual method of accounting to its shareholders and the public. We see this incongruity as a weakness in petitioner's position, along with the fact that GAAP, the SEC, and petitioner's creditors have required accrual method reporting. "A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income * * *." Sec. 1.446-1(a)(2), Income Tax Regs. *493 Petitioner interprets "trade or business" in this regulation to mean "industry" rather than the taxpayer's specific business. Respondent, on the other hand, limits the term "trade or business" only to the business of the taxpayer. According to respondent, if a taxpayer has been consistent in the use of a generally accepted method, then the taxpayer may rely upon the regulation. Assuming for the sake of argument that petitioner's interpretation is correct, petitioner contends that the software industry's standard is the cash method. The record does not support petitioner's contention, although there is some support for the proposition that software businesses are service businesses and that the cash method has been associated with service businesses. We have held, however, that petitioner's business has gravitated from a service- to a product-oriented business, with service as an adjunct to the product. Accordingly, it would be inappropriate to label petitioner solely as a "software business" and likewise inappropriate to associate it exclusively with software industry practices, to the extent that such practices exist. Petitioner also argues that it has consistently used the cash *494 method to report software sales for income tax purposes since its inception in 1975. Petitioner, however, has not used the cash method consistently for financial purposes, having used the accrual method since 1981 to report revenues from all sources for financial purposes. Moreover, consistency in method is less relevant or possibly irrelevant where, as here, the nature of the taxpayer's business changes. For the foregoing reasons, we hold that petitioner has not shown that respondent abused his discretion in determining that the cash method of accounting did not clearly reflect petitioner's software income. In order to reflect concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. For convenience we refer to this portion of petitioner's business activity as "software business."↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue. Rule references are to this Court's Rules of Practice and Procedure. ↩
3. For taxable years beginning after 1986 the cash method of accounting for tax reporting is not available to Subchapter C corporations with annual average gross receipts exceeding $ 5,000,000. Sec. 448, I.R.C. 1986↩.
4. We do not decide here whether the SEC accounting requirements in this case are the type that would create the presumptive situation which was developed in Commissioner v. Idaho Power Co., 418 U.S. 1↩ (1974).